**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Sheila Renee H., | |
| Plaintiff, | Civil No. 3:21-cv-00944-TOF |
| v. | |
| Kilolo Kijakazi, Acting Commissioner of Social Security,[1] | September 13, 2022 |
| Defendant. | |

**RULING ON PENDING MOTIONS**

The Plaintiff, Sheila Renee H.,[2] appeals the decision of the Commissioner of Social Security ("Commissioner" or "Defendant"), rejecting her application for Title XVI Supplemental Security Income benefits.  (Compl., ECF No. 1.)  She has moved the Court for an order reversing the Commissioner's decision and remanding for a "new hearing and decision" or "for a calculation of benefits."  (ECF No. 1, ¶ 8, *see also* ECF No. 19-2, at 17.)  The Commissioner has moved for an order affirming the decision.  (ECF No. 21.)

The Plaintiff raises five principal issues on appeal.  First, she contends that the Administrative Law Judge ("ALJ") erred in relying on a vocational expert's ("VE") testimony, which she argues was evasive and therefore unreliable.  (ECF No. 19-2, at 1-4.)  Second, she claims

---

[1]     When the Plaintiff filed this action, she named the then-Commissioner of the Social Security Administration, Andrew Saul, as the defendant.  (Compl., ECF No. 1.)  Commissioner Saul no longer serves in that office.  His successor, Acting Commissioner Kilolo Kijakazi, is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d).  The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[2]     Pursuant to Chief Judge Underhill's January 8, 2021, Standing Order, the Plaintiff will be identified solely by first name and last initial, or as "the Plaintiff," throughout this opinion.  *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

that the ALJ failed to consider her need for a job coach in assessing her ability to work. (*Id.* at 4-6.)  Third, she argues that the ALJ relied on "mental status examinations" by APRN Kathleen Africano that were actually not in the record. (*Id.* at 6-7.)  Fourth, she asserts that the ALJ derived clearly erroneous factual findings from the records of her counselor, LMSW Romene Bertier. (*Id.* at 7-11.)  Fifth and finally, the Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (*Id.* at 11-17.)  The Commissioner responds that the ALJ's decision was free from legal error and grounded in substantial evidence. (*See generally* ECF No. 21-1.)

Having carefully considered the parties' submissions, and having carefully reviewed the entire, 2,839-page administrative record, the Court agrees with the Commissioner.  Accordingly, the Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 19) will be **DENIED**, and the Commissioner's Motion for an Order Affirming the Decision (ECF No. 21) will be **GRANTED**, as set forth more fully in Section IV below.

I.    FACTUAL AND PROCEDURAL BACKGROUND

On March 18, 2019, the Plaintiff applied for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. (R. 245-52.)  She claimed that she could not work due to an ankle and back problems, muscle spasms, asthma and lung issues, anxiety disorder, memory loss, and attention deficit hyperactivity disorder ("ADHD"). (R. 104-05.)  She alleged a disability onset date of February 1, 2018. (R. 105.)

The Social Security Administration ("SSA") denied the Plaintiff's claim on September 30, 2019. (R. 104-24.)  The Plaintiff then appointed a representative (R. 165), and through him, she requested reconsideration of the initial decision. (*See* R. 167.)  The SSA denied her claim at the reconsideration level on December 31, 2019 (R. 126-52), and she requested a hearing before an ALJ. (R. 179.)  ALJ Ronald Thomas held a hearing on September 21, 2020. (R. 40-76.)

On November 3, 2020, the ALJ issued an unfavorable decision.  (R. 16-39.)  ALJs are required to follow a five-step sequential evaluation process in adjudicating Social Security claims, and ALJ Thomas's written decision followed that format.  At Step One of his analysis, he found that the Plaintiff had not engaged in substantial gainful activity since February 15, 2019.  (R. 18.)  He noted that she had worked briefly after that date at the Home Goods retail chain "under a transitional employment program by the Bridge House," but her earnings in that position "[did] not exceed substantial gainful activity thresholds."  (*Id.*)

At Step Two, the ALJ found that the Plaintiff suffered from several severe impairments.  (R. 18-19.)  With respect to physical impairments, he found her right ankle degenerative joint disease and peroneal tendon tear to be severe, but concluded that her asthma, obesity, degenerative disc disease and substance abuse disorder were not.  (*Id.*)  With respect to mental impairments, he found the Plaintiff's ADHD, anxiety disorder, and depressive disorder were severe.  (*Id.*) And although the Plaintiff had not listed her posttraumatic stress disorder ("PTSD") as a disabling condition on her application (R. 104-05), the ALJ found that to be a severe impairment as well.  (R. 18.)   Other than substance abuse disorder, he did not find any of the Plaintiff's mental impairments to be non-severe.  (R. 18-19.)

At Step Three, the ALJ concluded that the Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 19.)  He considered and rejected Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma- and stressor-related disorders).  (R. 19-20.)  He considered whether the "Paragraph B" and "Paragraph C" criteria had been satisfied, and

concluded that they had not.  (R. 19-21.)  He then determined that, notwithstanding her impairments, the Plaintiff retained the residual functional capacity to:

> [P]erform light work as defined in 20 CFR 416.967(b) except that she is limited to occasional bending, balancing, twisting, squatting, kneeling, crawling, and climbing, but never climbing of ladders, ropes, or scaffolds.  The claimant must avoid hazards such a heights, vibration, and dangerous moving machinery, including no driving.  The claimant is unable to operate right foot controls.  She is capable of performing simple, routine, and repetitive work tasks that does not require teamwork or working closely with the public.  The claimant is limited to occasional interaction with coworkers and supervisors, and no interaction with the public.

(R. 21.)

At Step Four, the ALJ found that the Plaintiff was capable of performing her past relevant work as a commercial cleaner.  (R. 27.)  Alternatively, he proceeded to Step Five and relied on the testimony of VE James Soldner to find that there are jobs that exist in significant numbers in the national economy that the Plaintiff could perform, including "marker II," "mail clerk" and "night cleaner."  (R. 28-29.)  Accordingly, the ALJ determined that the Plaintiff was not disabled from the date of her application through the date of his ruling.  (R. 29.)  On June 21, 2021, the Appeals Council denied the Plaintiff's request for review.  (R. 1-6.)

The Plaintiff then filed this action on July 9, 2021.  (Compl., ECF No. 1.)  On October 6, 2021, the Commissioner denied the allegations of the complaint by filing the Certified Administrative Record.  (ECF No. 1; *see also* Standing Scheduling Order, ECF No. 5, at 2 (stating that, in the District of Connecticut, the filing of administrative record is "deemed an Answer (general denial) to Plaintiff's Complaint").)  On January 31, 2022, the Plaintiff filed her motion for an order reversing the Commissioner's decision.  (ECF No. 19.)  On March 25, 2021, the Commissioner moved for an order affirming the decision.  (ECF No. 21.)  The Plaintiff filed  a reply brief on April 4, 2022, and briefing closed.  (ECF No. 22.)  The parties' motions are therefore ripe for decision.

4

## II.   APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).   To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).   At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments." *Id.*   At Step Three, the ALJ then evaluates whether the claimant's disability "'meets or equals the severity" of one of the "Listings" – that is, the specified impairments listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.*   At Step Four, the ALJ uses a residual functional capacity ("RFC") assessment to determine whether the claimant can perform any of her "past relevant work." *Id*.   And at Step Five, the ALJ considers "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.*   The claimant bears the burden of proving her case at Steps One through Four. *Id.*   At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).   Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal

error.  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner.  *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted).  When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment.  In other words, "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error.  Put differently, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

III.   DISCUSSION

As noted above, the Plaintiff raises five principal issues in this appeal.  First, she contends that the ALJ erred in relying on evasive and unreliable testimony from VE Soldner with respect to job coaching.  (ECF No. 19-2, at 1-4.)  Second, she claims that the ALJ failed to consider that, in her last two jobs, she was able to work only because she had such a coach.  (*Id.* at 4-6.)  Third, she argues that the ALJ erroneously relied on phantom "mental status examinations" from APRN Africano.  (*Id.* at 6-7.)  Fourth, she asserts that the ALJ derived clearly erroneous factual findings from LMSW Bertier's reports.  (*Id.* at 7-11.)  Fifth and finally, the Plaintiff contends that the ALJ's decision is not supported by substantial evidence.  (*Id.* at 11-17.)  The first and second arguments are related, as are the third and fourth.  The Court will discuss those arguments together in Sections III.A and III.B, respectively.

A.      **The Plaintiff's Arguments About Job Coaching and the VE's Testimony**

The Plaintiff claims that her mental impairments disable her from working without the assistance of a job coach, and she argues that the ALJ erred in his handling of this issue.  (ECF No. 19-2, at 5.)  At the hearing, she testified about her last job, a "maintenance/assembler" position at the Home Goods retail chain that had been arranged for her through a social services agency called Bridge House.  (R. 332-35, 55-56.)  The plaintiff stated that she had a job coach in that position because she "couldn't focus on anything too long."  (R. 55.)  She also testified about an earlier job with the John J. Masi Co.,[3] where she had "[a] guy named Tony" "supervising [her] on a regular basis."  (R. 56.)  On appeal to this Court, she contends that these brief statements – along with the fact that the Bridge House is a "supported employment" agency – constitute substantial

---

[3]      The company's name is misspelled as "Massey" in the hearing transcript and the Plaintiff's brief.  (*See* R. 56; Pl.'s Memo. at 2.)  The Plaintiff's payroll records confirm that the correct spelling is "Masi."  (R. 270.)

evidence of a total inability to work without a job coach, and that the ALJ therefore erred in failing to include a coaching requirement in the hypothetical question that he posed to the VE[4] and in his RFC.  (ECF No. 19-2, at 1-2; ECF No. 22, at 1-2.)  The Court disagrees.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion . . . and accurately reflect the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 151 (citations, quotation marks and brackets omitted).  A negative implication of this principle is that "the ALJ [is] *not* required to incorporate restrictions into the RFC or pose a hypothetical to [the VE] that [is] *not* supported by the record." *Margotta v. Colvin*, No. 13-cv-3219 (RWS), 2014 WL 2854623, at *13 (S.D.N.Y. June 23, 2014) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)) (emphasis added).  Put differently, "the ALJ is not required to find restrictions where the plaintiff fails to establish such a restriction." *Gaskin v. Berryhill*, No. 3:18-cv-1978 (RAR), 2020 WL 3958421, at *11 (D. Conn. July 13, 2020) (citing *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012)).  In *Gaskin*, the plaintiff contended that the ALJ erred in omitting a lifting restriction from his hypothetical, but he failed to "present any evidence that he is restricted in any way by what weight he can carry." *Id.*  The court sustained

---

[4]     The ALJ asked the VE to:

> assume an individual of the claimant's age, education, past relevant work experience who's limited to the light exertional level as defined, and is further limited by the need for firstly, occasional twisting and squatting, standing, and balancing, kneeling, crawling, and climbing, but no climbing of ropes, scaffolds, and ladders.  Secondly, needs to avoid hazards such as heights, vibration, dangerous machinery including driving.  Thirdly, no right foot controls. And fourthly, is capable of simple, routine, repetitive work that does not require teamwork or working closely with the public and occasional interaction with coworkers and supervisors , but not public interaction.

(R. 66-67.)  This hypothetical tracks the RFC and did not include the requirement of a job coach. (R. 21.)

the ALJ's decision, because the plaintiff had "not shown that the relevant evidence precludes a reasonable mind from finding" no such restriction.  *Id.*

In this case, the record did not contain evidence of a job coaching requirement sufficient to oblige the ALJ to include it in his hypothetical and RFC.  No medical or vocational provider opined about such a requirement; the Bridge House program manager said only that the Plaintiff had been given "job coaching as needed." (R. 335.)  And the Plaintiff herself did not say that she required a job coach to perform her work at Home Goods; rather, she said only that the Bridge House coach had to spend "a little bit" more time with her than with other program participants because of her lack of focus. (R. 55.)  With respect to her work with "Tony" at the John J. Masi Co., the Plaintiff testified only that he was someone who "supervis[ed her] on a regular basis." (R. 56.)  The fact that the Plaintiff was once "supervis[ed]" and "watch[ed] over" by "Tony" is an insufficient basis for concluding that the ALJ was obliged to include a job coaching requirement in his hypothetical and RFC.

Moreover, the asserted basis for needing a job coach – the Plaintiff's inability "to focus on anything" (R. 55) – was adequately addressed by the ALJ.  In the course of evaluating whether she met a Listing, the ALJ assessed the Plaintiff with only a "moderate limitation" in the dimension of "concentrating, persisting or maintaining pace." (R. 20; *see also* discussion, Section III.C *infra*.) He acknowledged that the Plaintiff had testified to "difficulty with concentration, including poor focus," and that her "treating psychiatric APRN" had observed "decreased concentration and focusing abilities due to her high anxiety." (*Id.*)  But he accurately noted that the Plaintiff's mental health reports "consistently relayed unremarkable and intact findings." (*Id.*) (citing R. 2613-2819). These reports documented the Plaintiff engaging in concentration exercises and responding to suggestions that she control her running thoughts (*e.g.*, R. 2621, 2631), and other reports

documented an ability to focus.  (*E.g.*, R. 2046) ("Anxiety better managed and is able to focus."). In short, substantial evidence supported the proposition that the Plaintiff's ability to concentrate was only moderately limited, and the Plaintiff failed to show that a job coach was required to address those moderate limitations.  *Cf. Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) (summary order) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits.")

The Plaintiff makes other arguments on the job coach issue, but none are persuasive.  She claims, for example, that there was "coordination between the VE and the ALJ" at or before the hearing (ECF No. 19-2, at 5), but there is no plausible evidence of that.  (*See* R. 64) (statement by VE that he had not discussed his testimony with the ALJ prior to the hearing.)  She argues that the VE's testimony on the job coach issue was "evasive" (ECF No. 19-2, at 1), but the record makes clear that while the VE initially struggled to understand the Plaintiff's attorney's questions, he ultimately answered them squarely.  (R. 72) (affirming that, *if* a claimant required a job coach for a particular job, that would "preclude that person from performing that job in a competitive work environment".)  Finally, the Plaintiff argues that the ALJ erred in concluding that the John J. Masi Co. job constituted "substantial gainful activity" – because she says that she required a job coach in that position, and that requirement rendered the job insubstantial even though she earned over $13,000 at it.  (ECF No. 19-2, at 5; *see also* R. 260-61.)  Yet even if the Plaintiff were correct that a coaching requirement renders a job insubstantial, she has not adequately supported such a requirement for the reasons stated above.

### B.      The Plaintiff's Claims About Her Mental Status Exams

The Plaintiff next argues that "the ALJ made clearly erroneous factual findings based on non-existent mental status exams."  (ECF No. 19-2, at 6.)  In the course of assessing whether the Plaintiff satisfied a Listing, the ALJ repeatedly referenced her "mental status exams during appointments at Southwest" Community Health Center, the facility at which she received therapy and counseling from APRN Africano and LMSW Bertier.  (*E.g.*, R. 20.)  The ALJ also cited the results of "mental status exams" as a reason for concluding that the Plaintiff's "statements concerning the intensity, persistence and limiting effect of [her] symptoms are not entirely consistent with the medical evidence."  (R. 22, 24.)  On appeal to this Court, the Plaintiff asserts that there are no genuine, comprehensive mental status examination reports in the record at all, and that the ALJ therefore relied on evidence that does not exist.  (ECF No. 19-2, at 6) (stating that the record contains no mental status examination reports from APRN Africano, and that the lone mental status examination report from LMSW Bertier is incomplete).

The Commissioner responds that the "Plaintiff's argument is based on too narrow a reading of the ALJ's findings."  (ECF No. 21-1, at 6.)  She notes that "while not all the records from" APRN Africano and LMSW Bertier "contain formal or complete MSEs, or portions of treatment records specifically labeled as an 'MSE,' the ALJ properly cited these records in assessing Plaintiff's mental impairments, including findings and observations throughout these treatment records that were inconsistent with the Plaintiff's allegations of disabling mental impairments."  (*Id.*)  Without putting it exactly this way, the Commissioner suggests that while the ALJ may have been careless or imprecise in his use of the term "mental status examination," using it to describe therapy sessions that did not include a full exam, he nevertheless evaluated the medical evidence

in accordance with the regulations and deserves to be affirmed.  The Court agrees with the Commissioner.

To be sure, the Plaintiff is factually correct about a number of things.  It is true that APRN Africano did not document a full mental status exam during the Plaintiff's first visit (R. 799), and that the reports of subsequent visits document "no significant change" in a number of instances. (*E.g.*, R. 805.)  Thus, the Plaintiff appears to be right when she says that "there is no MSE in the record serving as a baseline from which there have been no significant changes." (ECF No. 22, at 3.)  She also correctly notes that APRN Africano did not document any testing with respect to memory and cognition.  (ECF No. 19-2, at 6.)  And the Plaintiff correctly observes that the checkbox and narrative portions of LMSW Bertier's reports are often in tension with each other. (*Id.* at 7-10) (noting, for example, that "[e]ven after plaintiff reported having unprotected sex with someone she knew when she was using drugs, no change was made to the 'insight' or 'judgment' category of" the report.)  But the Plaintiff fails to explain why all of this constitutes a reversible legal error or failure of substantial evidence.

The ALJ reviewed the Africano and Bertier reports as part of his evaluation of the Plaintiff's symptoms, an evaluation that must be done according to a well-established two-step process. *See* 20 C.F.R. § 416.929(c)(1); *see also* Soc. Sec. Ruling ("SSR") 16-3P, 2017 WL 5180304, at *3 (S.S.A. Oct. 25, 2017) ("We use a two-step process for evaluating an individual's symptoms."). In the first step of the process, the ALJ must determine whether the "medical signs or laboratory findings" show that the claimant "has a medically determinable impairment . . . that could reasonably be expected to produce" her symptoms.  *Id.*  If so, the ALJ then proceeds to the second step, at which he evaluates "the intensity and persistence of [the claimant's] symptoms such as

pain," and determines the extent to which those symptoms "limit his or her ability to perform work-related activities." *Id.* at \*4; *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

At the second step, "the ALJ must consider all of the available evidence, including objective medical evidence, from both medical and nonmedical sources." *Gonzalez v. Berryhill*, No. 3:18-cv-00241 (SRU), 2020 WL 1452610, at \*12 (D. Conn. Mar. 25, 2020). The ALJ "may not reject a claimant's subjective opinion regarding the intensity and persistence" of her symptoms "solely because the available objective medical evidence does not substantiate . . . her statements." *Id.* (quoting 20 C.F.R. § 416.929(c)(2)) (alteration omitted); *see also* 20 C.F.R. § 404.1529(c)(2). If there is a conflict between the objective evidence and the claimant's testimony, "the ALJ 'must consider the other evidence,'" including "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; (5) treatment, other than medication, received for pain relief; (6) measures taken to relieve pain and other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Gonzalez*, 2020 WL 1452610, at \*12 (quoting *Graf v. Berryhill*, No. 3:18-cv-00093 (SRU), 2019 WL 1237105, at \*8 (D. Conn. Mar. 18, 2019)) (internal quotation marks and alterations omitted).

Provided that the ALJ follows this process, his conclusions are entitled to deference from this Court. "It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). These findings "are entitled to great deference and therefore can be reversed only if they are 'patently

unreasonable.'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (quoting *Lennon v. Waterfront Transp.*, 20 F.3d 658, 661 (5th Cir. 1994)); *see also Gonzalez*, 2020 WL 1452610, at *13 (same).

In this case, the ALJ followed the process set out in the Social Security regulations and rulings.  He began by reviewing the Plaintiff's medical conditions – including her depression, PTSD, and "significant history of horrific trauma" – and concluded that her "medically determinable impairments could reasonably be expected to cause" the symptoms that she claimed. (R. 22.)  Moving to the second step, he contrasted the Plaintiff's statement of her symptoms and limitations with the statements and limitations documented in the Africano and Bertier reports. (R. 23-26.)  Among other things, he noted the tension between the Plaintiff's claim to "be unable to be around other people due to severe paranoia," and APRN Africano's note that she "love[d] the job" at Home Goods and "like[d] helping people."  (R. 22, 23) (citing R. 1230.)  He also noted the conflict between the Plaintiff's claim to be unable to focus, and APRN Africano's notes documenting an ability to do so.  (R. 24; *see also* R. 2046 (February 7, 2019 note by APRN Africano stating that Plaintiff's "[a]nxiety [is] better managed" and she "is able to focus").) Importantly, he did not stop with these observations; instead, he went on to consider the other applicable 20 C.F.R. § 416.929(c)(3) factors.  For example, he considered the Plaintiff's activities of daily living when he noted that she did her own grocery shopping, helped take care of her mother, and visited family on Thanksgiving and New Year's.  (R. 24) (citing R. 2779, 2557, 2677, 2686.)  He also considered the degree to which the Plaintiff's symptoms responded to medication and treatment.  (*E.g.*, R. 23 (citing Africano report at R. 1230 that medication had been "effective" and Plaintiff was "cheerful and positive"); R. 24 (citing Africano report at R. 2046 that medication "has been helpful" and that Plaintiff was "[c]almer and more focused").)

14

Nor did the ALJ "cherry-pick" the record, as the Plaintiff contends.  (ECF No. 22, at 8.) "The term 'cherry' picking generally refers to improperly crediting evidence that supports findings while ignoring evidence from the same source." *Sonia N.B.A. v. Kijakazi*, No. 3:21-cv-709 (TOF), 2022 WL 2827640, at \*8 (D. Conn. July 20, 2022) (quoting *Rodriguez v. Colvin*, No. 3:13-cv-1195 (DFM), 2016 WL 3023972, at \*2 (D. Conn. May 25, 2016)).  In this case, the ALJ considered the bad as well as the good in the Africano and Bertier reports.  He noted, for example, that the Plaintiff's symptoms worsened in August 2019, and that she had a major panic attack in the following October.  (R. 24.)  He also referenced LMSW Bertier's notes from the beginning of the COVID-19 pandemic, when the Plaintiff reported "increased anxiety" because she "knew of people whom [sic] had died from the coronavirus."  (*Id.*)  Additionally, the ALJ noted "reports of worsening memory possibly due to medications" in 2020.  (*Id.*)  Sometimes, that which a claimant calls "cherry-picking" "is more accurately described as merely weighing the evidence." *Sonia N.B.A.*, 2020 WL 2827640, at \*12.  That is the case here.

Because the ALJ followed the Social Security regulations and rulings when considering the Africano and Bertier reports, and because he did not cherry-pick the record with respect to them, his conclusions are entitled to deference.  As noted, "[i]t is the role of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including with respect to the severity of a claimant's symptoms." *Cichocki*, 534 F. App'x at 75 (quotation marks omitted).  Thus, if indeed there were conflicts or inconsistencies within the Africano and Bertier reports, it was the ALJ's role to resolve them.

### C.   The Plaintiff's Attacks on the Substantiality of the Evidence Supporting the ALJ's Decision

Finally, the Plaintiff argues that the ALJ's decision is not supported by substantial evidence. (ECF No. 19-2, at 11-17.)  She makes three principal arguments under this heading.  First, she

asserts that the ALJ erred at Step Two of the five-step evaluation process when he failed to include major depression and schizoaffective disorder among her severe impairments.  (*Id.* at 11-13.) Second, she says that the ALJ erred at Step Three when he concluded that she did not satisfy any Listing; she contends that she met Listing 12.03 (schizoaffective disorder) and 12.06 (anxiety disorder).  (*Id.* at 13-15.)  Third, she argues that the ALJ erred in his treatment of the opinion evidence.[5]  (*Id.* at 15-17.)  In support of these arguments, she cherry-picks the record herself; her brief contains a seven-page recitation of the record evidence supporting these impairments, but it does not seriously contend with the contradictory evidence.  For this reason and the others cited below, the Court rejects this argument and concludes that the ALJ's decision was supported by substantial evidence.

### 1.   *The Plaintiff's claim of Step Two error*

The legal principles governing Step Two are well settled.  At that step, the ALJ must determine whether the claimant has a severe, medically determinable impairment that has lasted or is expected to last for at least twelve months.  20 C.F.R. § 416.920(a)(4)(ii).  The SSA's regulations do not define the term "severe impairment," but instead define "non-severe impairment."  *Dawn Lyn C. v. Kijakazi*, No. 3:20-cv-545 (TOF), 2021 WL 4398372, at *4 (D. Conn. Sept. 27, 2021) (quoting *Larkin v. Astrue*, No. 3:12-cv-35 (WIG), 2013 WL 4647243, at *5

---

[5]      In her reply brief, the Plaintiff asserted for the first time that the ALJ "failed to fully apply the special technique for analyzing mental health cases."  (ECF No. 22, at 9-10.)  Her argument strikes the Court as a recapitulation of her job coaching argument (*see id.* at 10),  which has already been addressed above.  But to the extent that it is an independent attack on the ALJ's compliance with 20 C.F.R. § 416.920a, the Court rejects it.  It is well established that "[a]rguments may not be made for the first time in a reply brief."  *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).  Moreover, in this case the ALJ carefully evaluated the Plaintiff's limitations in the "four broad functional areas" that the "special technique" required him to assess, 20 C.F.R. § 416.920a(c)(2), and he rated her limitations in each area according to the five-point scale set forth in 20 C.F.R. § 416.920(a)(4).  (R. 19-21.)

(D. Conn. Apr. 29, 2013), *report and recommendation adopted in part, rejected in part*, 2013 WL 4647229 (D. Conn. Aug. 29, 2013)).  "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 416.922(a); *see also* Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996).  By implication, therefore, a "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work."  *Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order).

The Plaintiff faults the ALJ for failing to include "major depression" among her severe impairments (ECF No. 19-2, at 11), but he did list "depressive disorder" as such an impairment. (R. 18.)  Moreover, the ALJ expressly stated that the Plaintiff's depressive disorder "significantly limit[s] [her] ability to perform basic work activities."  (R. 19.)  To the extent that the ALJ erred in failing to characterize the disorder as "major" at Step Two – and it is not clear that he did[6] – the Plaintiff fails to explain how that error was harmful.  "[W]here the ALJ considers all impairments at later stages of the analysis, failure to find a particular impairment 'severe' at Step Two, even if error, is harmless error."  *Kazlauskas v. Berryhill*, No. 3:18-cv-544 (KAD), 2019 WL 4605282, at *3 (D. Conn. Sept. 23, 2019) (citing *Rivera v. Colvin*, 592 F. App'x 32, 33 (2d Cir. 2015) (summary order)); *see also Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order).

---

[6]     While the psychiatric profession distinguishes between major depressive disorder and other depressive disorders, *see* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 155-88 (5th ed. 2013), the Plaintiff's consulting psychologist, Dr. Wendy Levy, evidently did not diagnose her with the former.  (*See* R. 2833) (including only "Post Traumatic Stress Disorder – Severe," "Schizoaffective Disorder – Bi-polar Type" and "Cocaine Use Disorder – in remission" as "diagnostic impressions").  After administering a "Personality Assessment Inventory," Dr. Levy wrote that "the diagnostic groups with the highest coefficient of fit with profiles similar to [the Plaintiff's] include . . . [m]ajor depressive disorder." (R. 2828.)  But saying that the Plaintiff's profile is similar to the profiles of people with major depressive disorder is not the same as a diagnosis.

Here, the ALJ considered the Plaintiff's depressive disorder and her consequent limitations at the subsequent steps in the five-step evaluation process.  (*See, e.g.*, R. 21 (addressing, at Step Three whether the record supported "significant mood fluctuations"); R. 22 (recounting Plaintiff's testimony about the "severe mental symptoms" that flowed from "her depression and PTSD" when formulating the RFC); R. 23-24 (repeatedly referencing Plaintiff's mood and "mood symptoms" when reviewing the medical record for RFC purposes).)

The Plaintiff also faults the ALJ for failing to identify schizoaffective disorder as a severe impairment at Step Two, but here too, she fails to show that any error was harmful.  Although the ALJ did not include schizoaffective disorder as a separate, severe impairment at Step Two, he did discuss Dr. Levy's diagnosis in the course of formulating the RFC.  (R. 18, 26.)  He noted that Dr. Levy did not translate her diagnosis into any "specific functional limitations."  (R. 26.)  The Plaintiff bears the burden to prove a more restrictive RFC, *Smith*, 740 F. App'x at 726, and she has not met that burden with respect to schizoaffective disorder.

### 2.    *The Plaintiff's claim of Step Three error*

The Plaintiff contends that the ALJ erred when he failed to hold at Step Three that she met Listings 12.03 and 12.06.  (ECF No. 19-2, at 13-15.)  Listing 12.03 covers schizophrenia spectrum and other psychotic disorders, and Listing 12.06 addresses anxiety and obsessive-compulsive disorders.   20 C.F.R. Part 404, Subpart P, Appendix 1.   Both Listing have "Paragraph A," Paragraph B," and "Paragraph C" criteria, and both require claimants to satisfy Paragraph A and either Paragraph B or C.

The two Listings have different Paragraph A criteria, but their Paragraph B and Paragraph C criteria are the same.   In the case of Listing 12.03, Paragraph A requires "delusions or hallucinations," "disorganized thinking (speech)," or "grossly disorganized behavior or catatonia."

*Id.* In the case of Listing 12.06, Paragraph A requires "anxiety disorder," "panic disorder or agoraphobia," or "obsessive-compulsive disorder" characterized by certain symptoms.[7] *Id.* In both Listing 12.03 and Listing 12.06, Paragraph B requires an "extreme limitation of one, or marked limitation of two" of four areas of mental functioning – understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* Paragraph C requires that the mental condition be "'serious and persistent,' that is, [the claimant has] a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both . . . [m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [her] mental disorder . . . and . . . marginal adjustment." *Id.* "For a claimant to show that [her] impairment matches a listing, [she] must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

The Plaintiff claims to have met the Paragraph A and Paragraph B criteria for both Listings[8] (ECF No. 19-2, at 13-14), but the Court disagrees. With respect to Listing 12.03's Paragraph A, she asserts that her belief in spells and psychics constitutes a "delusion," and she notes that Dr. Levy called her speech "rushed and disorganized." (*Id.* at 13) (citing R. 2820-33.) And with respect to Listing 12.06, she claims that her "difficulty concentrating," "panic attacks," and

---

[7]    Specifically, anxiety disorder must be "characterized by three or more of the following" symptoms: "Restlessness, easily fatigued, difficulty concentrating, irritability, muscle tension, or sleep disturbance." *Id.* Panic disorder or agoraphobia must be characterized by one or both of "panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences, or . . . disproportionate fear or anxiety about at least two different situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces)." *Id.* Obsessive-compulsive disorder must be characterized by one or both of "involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or . . . repetitive behaviors aimed at reducing anxiety." *Id.*

[8]    The Plaintiff does not even claim to have met the Paragraph C criteria (*see* ECF No. 19-2, at 13-15), and accordingly the Court will not address them.

"extreme sleep disturbance" satisfy Paragraph A.  (*Id.* at 14.)  Yet even if Paragraph A is satisfied, substantial evidence supported the ALJ's conclusion that Paragraph B is not.

In the first of the four areas of mental functioning to be assessed under Paragraph B – "understanding, remembering or applying information" – the ALJ reasonably found that the Plaintiff had only a "mild limitation."  (R. 20.)  He acknowledged consulting psychologist Levy's evaluation of "a Full Scale IQ score of 76," below average short-term memory," and "significantly low" long-term memory.  (*Id.*) (citing R. 2825-27.)  Yet he also noted that the Plaintiff's treating providers consistently documented memory and cognition "within normal limits," along with "good judgment and insight."  (*Id.*)  LMSW Bertier consistently reported that the Plaintiff's thought process was "logical", and perception, thought content cognition and insight were "within normal limits."  (*See, e.g.*, R. 2614, 2618, 2629, 2634, 2639, 2644, 2650, 2655, 2659, 2664, 2669, 2679, 2684, 2689, 2694, 2699, 2705.)

In the second area – "interacting with others" – the ALJ found a "moderate limitation."  (R. 20.)  He "accept[ed] that the claimant has some limitations" in this area, noting her testimony that "she has significant anxiety and stress from being around strangers, including taking public transportation". . . and that "due to past trauma, she does not trust others and is unable to work around others."  (*Id.*; *see also* R. 54, 60-61.)  He also observed, however, that the Plaintiff "lives near her mother, helps take care of her mother, spent a great Thanksgiving with her extended family and had a good time."  (*Id.*; *see also* R. 2557, 2667, 2686, 2768, 2793.)  The ALJ also noted that the Plaintiff was "[w]orking part time in a big retail store and loves the job," and "like[d] helping people."  (*Id.*, *see also* R. 1230).)  These facts constitute substantial evidence for a moderate limitation in the area of interacting with others.  *See, e.g.*, *Krystle H. v. Comm'r of Soc. Sec.*, No. 3:20-cv-855 (TWD), 2022 WL 888225, at *7 (N.D.N.Y. Mar. 25, 2022) (noting that

activities of daily living can supply substantial evidence for a mental RFC).  Moreover, the ALJ reflected that moderate limitation in the RFC when he limited the Plaintiff "to occasional interaction with coworkers and supervisors, and no interaction with the public."  (R. 21); *see Reilly v. Colvin*, No. 1:13-cv-00785 (MAT), 2015 WL 6674955, at *3 (W.D.N.Y. Nov. 2, 2015) ("[G]enerally a limitation to only 'occasional' or 'limited' contact with others has been found sufficient to account for moderate limitations in social functioning.").

The ALJ's conclusion that the Plaintiff had a "moderate limitation" in the third area – "concentrating, persisting, and maintaining pace" – is likewise supported by substantial evidence. The ALJ acknowledged the Plaintiff's testimony about "difficulty with concentrating, including poor focus on reading due to her high anxiety, panic attacks and other psychological symptoms." (R. 20.)  He also cited mental medical source statements from APRN Africano, in which the nurse observed "decreased concentration and focusing abilities due to her high anxiety."  (R. 20) (citing R. 2172-77, 2606-11.)  At the same time, he also explained that the Plaintiff's treaters at the Southwest Community Health Center repeatedly documented "unremarkable and intact findings, in addition to noting that the claimant was able to discuss her concerns and stressors during video therapy appointments."  (R. 20; *see also* R. 2614, 2619, 2625, 2629, 2634, 2639, 2644, 2650, 2655, 2659, 2664, 2679, 2684, 2689. 2699, 2705, 2710, 2735, 2750.)   And although she observed "decreased concentration and focusing abilities" (R. 2174), APRN Africano nonetheless stated that the Plaintiff had become "more focused" with medication.  (R. 2046.)

In the fourth area – "adapting or managing oneself" – the ALJ found a "mild limitation." (R. 20.)  He noted that the Plaintiff "lives by herself, is able to perform most activities of daily living independently including doing household chores and going to medical appointments by herself," including moving to Stamford to be closer to her mother and to help care for her.  (*Id.*;

*see also* R. 2557, 2793.)  She consistently complied with her medication regime.  (*See, e.g.*, R. 2641, 2646, 2657, 2666.)  In short, even if the Plaintiff satisfied Listing 12.03's Paragraph A criteria, substantial evidence supports the conclusion that she did not satisfy Paragraph B.

### 3.     *The Plaintiff's attacks on the ALJ's treatment of the opinion evidence*

In a final, cursory argument, the Plaintiff questions the ALJ's treatment of the opinion evidence.  (ECF No. 19-2, at 15-17.)  She argues that the ALJ "dismisse[d] all of the opinion evidence to varying degrees including the report provided by Dr. Levy, two Mental Medical Source statements completed by APRN Africano . . . and the consulting exam report obtained by the [SSA] from Annemarie Infantino Murphy, Ph.D."  (*Id.* at 15-16.)  She then recapitulates the Murphy, Africano, and Levy reports, but does not meaningfully explain how the ALJ's treatment of those reports traversed the SSA regulations.  (*Id.* at 16-17; *see also* ECF No. 22, at 7-9.)  For the reasons that follow, the Court does not accept this underdeveloped argument.

The SSA has adopted new regulations regarding the treatment of medical opinion evidence for claims filed on or after March 27, 2017.  *See* 20 C.F.R. § 416.920c.  Because the Plaintiff filed her application after that date (R. 245), the new regulations apply to her claim.  *Id.*; *see also Juan T. v. Kijakazi*, No. 3:20-cv-1869 (SALM), 2021 WL 4947331, at *5 (D. Conn. Oct. 25, 2021). Under those regulations, ALJs are no longer required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a)." Put more simply, "[u]nder the new Regulations, 'no particular deference or special weight is given to the opinion of a treating physician.'" *Juan T.*, 2021 WL 4947331, at *4 (quoting *Quiles v. Saul*, No. 19-cv-11181 (KNF), 2021 WL 848197, at *9 (S.D.N.Y. Mar. 5, 2021)).  "Nevertheless, it bears noting that the new Regulations explicitly acknowledge that 'a medical source may have a

better understanding of [a claimant's] impairments if he or she examines [the claimant] than if the medical source only reviews evidence'" in a file. *Id.* (quoting 20 C.F.R. § 416.920c(c)(3)(v)).

The new regulations not only changed the rules for assigning weight to medical opinions; they also changed the rules governing how ALJs must explain their weight assignments in their written decisions. When determining the persuasiveness of a given medical opinion, ALJs must consider its supportability; its consistency; the length of the source's treating relationship with the claimant, including the frequency of examinations and the purpose and extent of the relationship; the specialization of the source; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 416.920c(c). In considering "supportability," ALJs are directed to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s) . . . ." 20 C.F.R. § 416.920c(c)(1). The "consistency" factor goes to the opinion's consistency with other evidence in the record; "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2). In his written decision, the ALJ must explicitly articulate how he considered the supportability and consistency factors. *See* 20 C.F.R. § 404.1520c(b)(2). He may, but is not required to, explain how he considered the other factors. *Id.* Provided that the ALJ follows these legal principles, and further provided that his decisions are supported by substantial evidence, his treatment of a given medical opinion is entitled to deference from the Court. *See, e.g.*, *Joey A. v. Comm'r of Soc. Sec.*, No. 3:21-cv-244 (SALM), 2022 WL 855584, at *7 (D. Conn. Mar. 23, 2022) (affirming ALJ's decision in part because he "properly considered the required factors when evaluating the persuasiveness of" a medical opinion, and "substantial evidence supports the ALJ's evaluation").

In this case, the ALJ regarded APRN Africano's medical source statements as "partially persuasive." (R. 26.) He accepted them as evidence that the Plaintiff's "mental impairments result[] in some limitations in mental functioning," but he declined to accept their characterization of the severity of the Plaintiff's limitations. (*Id.*) In doing so, he specifically discussed the supportability of the opinions; he noted that the most "severe limitations are not supported by Ms. Africano's treatment notes, which consistently reported stable, unchanged mood, and intact mental status findings." (*Id.*) He also specifically addressed the consistency factor when he noted that APRN Africano's medical source statements were "not consistent with the claimant's other treatment notes, notably monthly psychotherapy visits, which also reported stable mood, medication compliance, and acceptance of therapy coping skills and techniques." (*Id.*) Moreover, he cited to sixteen record exhibits supporting these statements. (*Id.*) Because he followed the regulations, and because his conclusions are supported by substantial evidence in numerous exhibits, the Court will not disturb his treatment of the Africano opinions.

The ALJ also did not err when assessing the opinion of the Plaintiff's consultative examiner, Dr. Levy. Although the ALJ acknowledged that Dr. Levy's examination had been "thorough," he regarded her opinions as only "partially persuasive," for two principal reasons that addressed supportability and consistency. (R. 26.) First, he observed that her opinion did "not contain any specific functional limitations, such as whether the claimant could perform simple and routine work, sustain concentration for a certain length of time, or what degree of social interaction in the workplace." (*Id.*) Second, he explained that her "one time assessment was not consistent with the claimant's longitudinal and extensive treatment notes at Southwest Community Health Center, which predominantly noted intact mental status findings and improved mood over time." (*Id.*) (citing nine voluminous record exhibits.) As with APRN Africano, the ALJ followed the

regulations with respect to Dr. Levy, and his conclusions were supported by substantial evidence stretching over the length of the Plaintiff's treatment relationship with Southwest.

Finally, the ALJ also handled Dr. Murphy's opinion appropriately.  He found Dr. Murphy's opinion "minimally persuasive" for two principal reasons.  (*Id.*)  Addressing supportability, he noted that "[a]lthough Dr. Murphy included clinical findings, she only provided general statements, such as whether it was unclear if the claimant could work independently." (*Id.*) (citing R. 1552.)  And addressing consistency, he concluded that the doctor's assessment was "not consistent with the claimant's longitudinal mental health treatment records at Southwest Community Health Center," which repeatedly described "stable moods, medication compliance, no significant changes in mental status, and improvement over time." (*Id.*) (citing nine record exhibits.)  As required by the new regulations, the ALJ explained his findings regarding the supportability and consistency of the opinion, and referred to specific and substantial evidence in the record supporting those findings.  Because he did so, the Court declines to second-guess him.

## IV.   CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that the ALJ's decision was supported by substantial evidence and free from legal error.  Therefore, the Plaintiff's Motion for Order Reversing or Remanding the Commissioner's Decision (ECF No. 19) is **DENIED**.   The Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 21) is **GRANTED**.

This is not a recommended ruling.  The parties consented to the jurisdiction of the undersigned Magistrate Judge, who may therefore direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  (ECF No. 9.)  Appeals may be made directly to the appropriate United States Court of Appeals.  *See* 28 U.S.C. § 636(c)(3); Fed.

R. Civ. P. 73(c).  The Clerk of the Court is respectfully directed to enter judgment in favor of the Defendant, and to close this case.

So ordered this 13th day of September 2022 , at Hartford, Connecticut.

*/s/ Thomas O. Farrish*

Hon. Thomas O. Farrish
United States Magistrate Judge
